**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Case No. 20-cv-03487

VICTOR HERNANDEZ,

    Plaintiff,

v.

GAINOR & DONNER, ATTORNEYS AT LAW, and
RONALD GAINOR,

    Defendants.

**COMPLAINT AND JURY DEMAND**

Plaintiff Victor Hernandez ("Hernandez") by and through counsel, Mark Edward Scabavea of SCABAVEA & ASSOCIATES, LLC, respectfully alleges for his Complaint and Jury Demand as follows:

### I. INTRODUCTION

1. Hernandez brings this action against his former attorneys, Ronald Gainor ("Defendant Gainor") and his law firm Gainor & Donner, Attorneys at Law ("Defendant Firm"), sounding in legal malpractice, for their legal malpractice in handling of Hernandez's Criminal matter in the United States District Court of Colorado case number 17-cr-00134-CMA-10.

### II. JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction of this cause of action under 28 U.S.C. § 1332.

3. Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in the District of Colorado.

### III.   PARTIES

4. Plaintiff Victor Hernandez is an individual and a resident of the State of Colorado. Plaintiff resides at 1770 W. Mississippi Avenue, Lakewood, Colorado 80227.

5. Defendant Firm is a law firm that is a Florida Partnership that has its principal place of business in Florida. Defendant Firm's address is 3250 Street, Suite 405, Miami, Florida 33133. Defendant Firm's telephone number is (305) 537-2000.

6. Defendant Gainor is a licensed attorney in the State of Florida and is admitted to Practice in the United States District Courts for the States of Florida and Colorado and the United States Courts of Appeals for the Tenth and Eleventh Circuits. Defendant Gainor's business address is 3250 Street, Suite 405, Miami, Florida 33133. Defendant Gainor's telephone number is (305) 206-2008. Defendant Gainor made an appearance and represented Hernandez at the *James*, Change of Plea and Sentencing Hearings in 17-cr-00134-CMA-10.

### IV.   STATEMENT OF THE FACTS

7. On April 27, 2017, Hernandez was indicted in the United States District Court for the District of Colorado as one of 22 defendants in a cocaine conspiracy. The case number was 17-cr-00134-CMA and Hernandez was defendant 10. Specifically, Hernandez was charged with violation of Title 21, United States Code, Section 841(a)(1) and (b)(1)(C) and 18 U.S.C. Section 2 - Knowingly and

intentionally distributing and possessing with the intent to distribute a mixture and substance containing cocaine, a Schedule II controlled substance, and aiding and abetting the same. (1ss); 21 U.S.C. § 841(a)(1), (b)(1)(A)(iii), (b)(1)(B)(II)(ii) and 846 Conspiracy to Distribute and Possess with intent to distribute 280 grams or more of cocaine base (crack), and 500 grams or more of cocaine, both Schedule II controlled substances (1); 21 U.S.C. § 841(a)(1), (b)(1)(B)(II)(ii), Distribution and Possession with intent to distribute 500 grams or more of cocaine, a Schedule II controlled substance (38); 21 U.S.C. § 841(a)(1), (b)(1)(B)(ii)(II) Distribution and Possession with intent to distribute 500 grams or more of cocaine, a Schedule II controlled substance (38s); 21 U.S.C. § 841(a)(1), (b)(1)(C), (b) (1)(B)(ii)(II) and 846 Conspiracy to Distribute and Possess with intent to distribute a mixture and substance containing a detectable amount of cocaine base (crack), and 500 grams or more of cocaine, both Schedule II controlled substances (43s); all of which were felonies.

8. Hernandez was completely innocent of all of the charges in paragraph 8, noted above.

9. On May 8, 2017, Defendant Gainor entered his appearance on behalf of Hernandez for the aforementioned case.

10. Defendant Gainor initially told Hernandez that the representation would cost between $40,000.00 to $50,000.00. On May 12, 2017, Hernandez paid Defendant Gainor $20,000.00; on May 22, 2017, Hernandez paid Defendant Gainor $10,000.00. After the initial paid amount, Defendant Gainor told Hernandez that "I won't work for $40,000.00 to $50,000.00 for this type of case," or words to

that effect. From June 2017, up to and including the end of the case, Hernandez paid Defendant Gainor approximately $5,000.00 to $10.000.00 per month at the request of Defendant Gainor. Typically, Defendant Gainor would approach or call Hernandez and state that he needed a certain amount of money to proceed. Ultimately, Hernandez paid Defendant Gainor approximately $120,000.00 for Defendants Firm's and Gainor's representation in 17-cr-00134-CMA-10.

11. On diverse occasions throughout Defendants Firm's and Gainor's representation, Hernandez specifically told Defendants Gainor that he was completely innocent of all of the charges in the indictment. Hernandez was steadfast in this assertion and never waivered.

12. During the representation, Defendant Gainor invited Hernandez to Gainor's residence. Defendant Gainor offered Hernandez an alcoholic beverage but Hernandez declined stating, truthfully, that Hernandez could not drink because he was subject to the Court's UAs as part of Hernandez's pretrial release. Defendant Gainor then stated to Hernandez:

> Victor, more than a client, I see you as a friend. I never invite any client to my house. Jut trust me and be completely honest with me. I'm at the age that I can fuck a lady that is in her 20s, 30s, 40s, and 50s and 60s, and if I want even 70. I feel very confident with myself. Amber [Donner] is my ex-wife. And now I want you to be completely honest with me. Did you give Oscar the kilo [of cocaine]?"

or words to that effect, to which Hernandez replied: "No I didn't."

13. Throughout Defendant Gainor's representation of Hernandez, Defendant Gainor made various claims to Hernandez including but not limited to the following:

4

    a.  That of all of the defense attorney's that were assigned to the defendants in 17-cr-00134-CMA, Defendant Gainor was the "head defense attorney of all of the defense attorney's in the case," or words to that effect, and that the Court appointed him to this position.

    b.  That the Government has "a lot of evidence against you," or words to that effect, and that the Government has "videos of you dealing drugs," or words to that effect.

    c.  That the Government had evidence that Hernandez was the head of the conspiracy in 17-cr-00134-CMA, that is, the member of the conspiracy that controlled all of the other members and/or was the boss of all of the other members.

  14.  Even though Hernandez stated to Defendant Gainor that Hernandez was completely innocent, Defendant Gainor persisted in attempting to get Hernandez to plead guilty.  At some point during the representation, Defendant Gainor told Hernandez that if he did not plead guilty that Hernandez would:

  a.  Go to jail for over 15 years.

  b.  Hernandez's wife will probably be deported.

  c.  Hernandez's daughter may not receive life-saving treatment.

  15.  At some point during the representation, Defendant Gainor stated that if Hernandez did plead guilty that he would probably receive 1 year of confinement with 6 months of said confinement being home detention and that Hernandez would "get all of his rights back," or words to that effect.

16. At some point during the representation, Defendant Gainor hired a polygrapher to administer a polygraph to Hernandez. Hernandez underwent the polygraph at Defendant Gainor's request. The polygrapher stated that Hernandez passed the polygraph but, inexplicably, also stated that he personally thought Hernandez was lying.

17. Because of the aforementioned threats, promises and events noted above, Hernandez agreed to plead guilty.

18. On June 7, 2018, right before the change of plea hearing, Hernandez and his wife met with Defendants Gainor at Elway's in Denver, Colorado, which was within close proximity to the Court. At that meeting, Defendants Gainor asked if Hernandez was ready and/or pleased with his representation. Hernandez responded that he was not pleased and that he did not think that he should be pleading guilty to something he did not do. In response, Defendant Gainor grabbed the plea agreement in his hands and motioned to tear it up and stated "If you want I can tear this up right now," or words to that effect in a dramatic scene that made Hernandez's wife cry. This act further pressured Hernandez to plead guilty.

19. During the Sentencing Hearing, the Court, the AUSA and Defendant Gainor had the following exchange:

THE COURT: But that is all you have?

MS. RANGEL: That is all we have. And, Your Honor, what I would submit to you is that, as I indicated in my objections -- or, I am sorry, my response to the objections, you know, your conclusion of a preponderance of the evidence does not change even though we are now at sentencing. The evidence remains the evidence, and --

THE COURT: Well, there is some indications, although it is not law, that when -- and this comes from dissent at the Supreme Court; that when you are talking sentencing, it is not a preponderance any more when you are looking at sentencing increases like this, and it should actually be beyond a reasonable doubt. I don't know that that is the law, but I have done a lot of research on that, as well, to see what is the standard here. So, I found by a preponderance of the evidence, for purposes of the admission of James statements, co-conspirator statements. I don't know that you have any evidence that Mr. Hernandez actually distributed any cocaine. That was my ruling back then. When I looked into it more thoroughly, for purposes of the sentencing, if he had gone to trial, I don't think you could have convicted him.

MS. RANGEL: Okay.

THE COURT: I mean, it seems to me that Rossi -- Special Agent Rossi made some real great leaps in concluding that Mr. Hernandez was dealing drugs here. I mean, did they find anything that showed he ever had cocaine in his possession?

MS. RANGEL: Other than the evidence that you have already --

THE COURT: Just from the car?

MS. RANGEL: The phone calls leading up to --

THE COURT: But the phone calls say nothing. I have reviewed those numerous times trying to figure out where it was. And, of course, at the time, I didn't know what Mr. Hernandez' explanation was.

MS. RANGEL: And, Your Honor, I think that – I appreciate the Court's evaluation of these calls. If you also will recall, leading up to those calls from December to January, as Sergeant Rossi explained, is really this timeline of Spencer Antoine owing Hugo Moreno-Cortes, and those discussions that then loop in Estrada-Cortes; that once they were up on Estrada-Cortes' phone, lead them to the defendant. And, I think what is notable, is his arguments of this was for Estrada-Cortes' wife, who had cancer, it was a $7,000, none of that is in those phone calls, either. And, if you look at those phone calls –

THE COURT: Well, there is a load of money. There are references to some money that he needs to pay back. He has a thousand dollars or $1,500. But, there is nothing that actually, when I read those, that ties him to this drug conspiracy, at all.

7

MS. RANGEL: And, Your Honor, I'm not going to argue --

THE COURT: Nothing tangible.

*     *     *

THE COURT: And I was looking at that, too, because I am going, what is it -- if there is no evidence of any, what would be the base offense level? Because that bothers me, too. It bothers me that he had to forfeit $8,000 to get this plea agreement, when I just don't see that there is any evidence that this was related to drug dealing.

MS. RANGEL: And, Your Honor, I apologize for interjecting, but I have to be abundantly clear that that forfeiture of the money had absolutely nothing to do with this plea agreement. Absolutely nothing. We negotiated the terms of this plea agreement independent of saying that if he forfeits that, I will give you this plea. And I have to be abundantly clear.

THE COURT: Well, I am not saying the Government did anything wrong. But, I think, Mr. Hernandez, looking at the potential of going to prison if he didn't just give you everything you wanted, which included the forfeiture, but there is nothing that ties that $8,000 to any drug deal. And I'm looking at that going, I don't know that that's something I can accept. I mean, it puts his family in some real dire straits. As far as we know -- and that is his position; that this was money from the carniceria, from his business. But, I am really -- I think there have been mistakes. And I will openly admit that when I re-looked at this, I think if I had looked at this as carefully as I did for purposes of sentencing, and had I understood this case better at the time, I probably would not have found that there was enough to show that he was a co-conspirator.

MR. GAINOR: And a lot of what the defense did was -- keeping in mind, too, consideration of the family structure and the need for continuity in the family, but also looking at the earlier rulings and some of the nebulous phone calls and not wanting to take a risk in front of a jury -- this Court knows both the prosecutor and myself well from trying cases. You know, we are not afraid to swing it out, but this was a tortured case from the beginning, in terms of our metric. And, then, to the Government's credit, a lot of the pressure was removed dealing with the secondary issues of at least the joint recommendation of something that, you know, we differ with regard to where the variance should fall. But, at least what we had secured from the very, very thoughtful Government prosecutor, in terms of

> the second part of the sentencing, which is the variance recommendation, you know, our goal was to make sure that we kept the family together.
>
> \*   \*   \*
>
> THE COURT: And, for purposes of sentencing, even though it may still be a preponderance of the evidence, I'm also aware of statements from the Supreme Court, at least individual Justices, that it should be a higher standard when you are looking at actually sentencing and increases in sentence. I don't know that I would find the same way today. So, not sure what to say with respect to that, but I think for purposes of the James hearing, I can see what pressure that then put on Mr. Hernandez to say, do I want to risk rolling the dice and go to trial and if I am found guilty, or do I want to just do what is necessary to get this pled out and to try to get the best sentence I could. So this is the first -- I spent days on this, because I am going, whoa, his liberty -- everybody's liberty is always at stake. But, in this case, I am going, don't think there is any evidence here. I really don't think there is any evidence to tie him to this drug conspiracy, other than his admission [in the change of plea hearing] that he did loan Mr. Estrada this money, and he turned a blind eye toward -- put his head in the sand that this was going to be used for drugs.

This conversation at the Sentencing Hearing indicates that the Court did not think the Government could have convicted Hernandez at trial, that the plea deal was forced upon Hernandez by both Defendant Gainor and the Government, and that the only evidence against Hernandez was Hernadez's admission that he "turned a blind eye . . . put his head in the sand" which he made at the behest of Defendant Gainor during the Change of Plea Hearing. Worse, Defendant Gainor congratulates the AUSA for offering the plea deal.

20. The Court sentenced Hernandez to one-years' supervised release because of the lack of evidence on only sentenced Hernandez to that because of Hernandez's admission at the Change of Plea.

21. After the Sentencing hearing Defendant Gainor stated to Hernandez "we are going to sue the Federal government!" or words to that effect but later stated to Hernandez: "why should we sue the Federal government for $100,000.00; Victor what are you going to do with $100,000.00 in the bank anyway" or words to that effect.

## V.   CLAIM FOR RELIEF
### Legal Malpractice
### (against all Defendants)

22. Hernandez incorporates by reference the preceding allegations of this Complaint as though each was individually set forth herein at length.

23. Defendants owed a duty of care to Hernandez.

24. Defendants breached the duty of care owed to Hernandez, thereby causing damages to Hernandez.

25. Defendants breached the duty of care by coercing Hernandez to plead guilty.

26. If Hernandez would have gone to trial in 17-cr-00134-CMA-10, he would have been acquitted.

27. But for Defendant's coercing Hernandez to plead guilty to a crime he was not guilty of, Hernandez would have been acquitted.

28. Defendants' coercion of Hernandez's guilty plea was the actual, direct and proximate cause of the damages sustained by Hernandez.

29.. Hernandez suffered the damages of being convicted of a crime that the Government could not prove beyond a reasonable doubt.

30. In fact, Hernandez was completely of the crimes/charges/counts alleged in 17-cr-00134-CMA-10.

## VI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Victor Hernandez respectfully requests that this Court enter judgment in his favor and against Defendant and grant:

1. For compensatory damages in an amount to be proven at trial;

2. For punitive damages in an amount to be proven at trial;

3. Declaratory relief as the Court deems proper;

4. For all costs, expenses, and attorney fees incurred by Plaintiffs as allowed by any statute, court rule, or contract;

5. For pre-judgment and post-judgment interest as permitted by statute or court rule; and;

6. For such other relief as the Court may deem just and proper.

## VII. DEMAND FOR TRIAL BY JURY

Plaintiff Victor Hernandez demands a trial to a jury on all issue so triable.

Respectfully submitted on this 24th day of November, 2020.

**SCABAVEA & ASSOCIATES, LLC**

s/ Mark E. Scabavea
MARK EDWARD SCABAVEA
301 Sheridan Blvd.
Lakewood, Colorado 80226
Office: (707) 592-5571
markscabavea@icloud.com
*Attorney for Plaintiff Victor Hernandez*